

vincecruz.rsp2

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 472-7332
Telecopier: (671) 472-7334

Attorneys for the United States of America

**FILED**
DISTRICT COURT OF GUAM

OCT 30 2007

JEANNE G. QUINATA
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 04-00053 |
| Plaintiff, | **GOVERNMENT'S REPLY TO DEFENDANT'S MOTION TO SUPPRESS** |
| vs. | |
| VINCE LUIS HOCOG CRUZ, | |
| Defendant. | |

In 2003, defendant was on parole, and supervised by parole officer Donna M. Cruz. On January 24, 2003, he and his girlfriend Millie Santos met with Ms. Cruz and asked permission for defendant to move into Santos' condominium in Tamuning, where she lived with her two-year-old daughter. Santos appeared to be indifferent to the fact defendant had been in prison for 3rd Degree Criminal Sexual Conduct. Cruz advised defendant could stay with Santos for the weekend, but was to report back to Ms. Cruz on Monday, January 27. He failed to appear, or to call.

Defendant was not employed, and subject to a curfew from 9 p.m. to 6 a.m. Ms. Cruz received information from Corrections Officer Taijeron that the defendant had been at McDonald's at midnight on January 22, 2003, and appeared to be intoxicated. Ms. Cruz determined to make a home visit to Santos' residence, B-31 Sunset Villa Condo in Tamuning. On January 29, 2007, as she and other parole officers approached, they noticed beer bottles

outside the front door. Ms. Cruz knocked on the door and the defendant answered. She asked if they could take a look around, and he agreed. Cruz noticed suspiciously valuable items in the living room, such as duty free display bottles of perfumes and a large screen TV. Defendant denied he had committed any curfew violations. In his bedroom, Parole Officer Liza Martinez found a blue bag on top of a DVD player, which contained ziplock baggies and an electronic scale. Martinez also found $9,023 in a dresser drawer. Ms. Santos arrived while defendant was handcuffed and sitting in the living room. He was removed and Ms. Santos later allowed the parole officers to continue their search. Ms. Martinez found an ice pipe in the wastebasket in defendant's bedroom, and a plastic bag of ice hidden in a blue jacket hanging in his closet. The DEA lab report indicates this bag contained 31.9 grams net weight of methamphetamine hydrochloride, 86% purity. These charges followed. Ms. Cruz' report is attached hereto as Exhibit 6.

## I. THE LAW

Title 9, Guam Code Annotated, § 80.76 lists many factors which the Parole Board is required to take into account in deciding whether to parole a prisoner. The first and foremost is that his release be "compatible with public safety and security." Exhibit 1. Title 9, G.C.A. § 80.80 lists the general requirements of parole, including that the subject visit his parole officer as may be required, answer all reasonable inquiries by the officer, and permit the officer to visit him at reasonable times at his home or elsewhere. Exhibit 2. Guam law makes the parole officer responsible for ensuring that someone released under this program complies with all the conditions, including mandatory drug testing. Exhibits 3 & 4. Every prisoner released from the Department of Corrections understands that his privacy rights have been greatly curtailed.

Defendant was paroled from the Guam Department of Corrections on February 7, 2002. Prior to his release, he read and signed a "Statement of Conditions Under Which this Parole is Granted," attached hereto as Exhibit 5. Condition 11(e) prohibited him from possessing or using any alcohol, as well as illegal controlled substances. In Condition 11(h), defendant consented to

- 2 -

allow parole officers "to search my person, vehicle and residence for firearms and illegal controlled substances at any time such a search is requested. Failure to allow a search will be considered a violation of parole."

## II. THERE IS NO FOURTH AMENDMENT VIOLATION IN THE WARRANTLESS SEARCH OF A PAROLEE'S RESIDENCE

A. Warrantless Searches of Persons on Probation

Defendant contends the warrantless entry and search of his residence was illegal because Guam law does not affirmatively allow the Parole Board to require parolees to waive their Fourth Amendment rights as a condition of their release, citing Griffin v. Wisconsin, 483 U.S. 868 (1987). The Wisconsin Department of Health and Social Services had promulgated regulations allowing probation officers to search a probationer's residence if the officer had "reasonable grounds" to believe it contained contraband. These regulations, however, were not in effect when defendant was sentenced to a term of probation. Apparently, Griffin had not executed a consent to waive his Fourth Amendment rights. His probation officer received a "tip" that Griffin had guns at his residence, which turned out to be accurate. Griffin contended that the officer's warrantless search violated his Fourth Amendment rights. The Court held that the warrantless search of a probationer's residence based upon a reasonable suspicion that he was engaged in criminal activity was "reasonable," because the state's operation of a probation system presented "special needs" beyond normal law enforcement. The restrictions on a probationer's rights were "meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." Id. at 875. The Court specifically declined to consider whether such a warrantless search would be valid in the absence of state regulations.

It addressed this issue, however, in United States v. Knights, 534 U.S. 112 (2001), where the defendant had been sentenced to probation for a California drug offense. He had signed a probation order acknowledging that he would submit his "person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest

- 3 -

Case 1:04-cr-00053 Document 17 Filed 10/30/2007 Page 3 of 18

or reasonable cause by any probation officer or law enforcement officer." Id. at 114. An investigation established a reasonable suspicion that Knights was involved in several arsons. Detectives searched his home, relying on the Fourth Amendment waiver in his probation order. The district court had suppressed the evidence found there, and the Ninth Circuit had affirmed, because the search was "investigatory," rather than "probationary," in nature. The government urged the Court to decide the case on the basis of consent, that Knights had accepted the search condition in lieu of imprisonment. The Court declined to reach this issue, however. "[W]e conclude that the search of Knights was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances ... with the probation search condition being a salient circumstance." Id. at 118, *citing* Ohio v. Robinette, 519 U.S. 33, 39 (1996). The Court analyzed "reasonableness," by "assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests," *citing* Wyoming v. houghton, 526 U.S. 295, 300 (1999). The probation order clearly set forth the search conditions, and Knights was "unambiguously informed of it." Id. at 119. It concluded that, given a probationer's significantly diminished privacy interests, an officer is entitled to effect a warrantless search of the defendant's residence based upon reasonable suspicion that he is engaged in criminal activity.

United States v. Keith, 375 F.3d 346 (5th Cir. 2004) concerned an appeal out of Louisiana, which has no state laws or regulations concerning conditions of release on probation, and the defendant had not signed any agreement. There is only a substantial body of state court decisions authorizing searches of a probationer's home based upon reasonable suspicion. Keith's probation officer had reason to believe he was building pipe bombs, and searched his home without a warrant. His motion to suppress was denied and he appealed. The Fifth Circuit declined to rest its decision on whether state law authorized such a warrantless search, or on whether defendant had executed an agreement allowing it. Rather, it applied the reasoning of Knights and Griffith, and balanced the intrusion of defendant's Fourth Amendment rights against

- 4 -

legitimate government interests. It emphasized that persons on probation only enjoy conditional liberty, conditioned on the special restrictions of their probation. It discounted the fact the defendant had not signed a written order of probation giving permission to search his home, reasoning that Louisiana courts had consistently approved the practice of searching probationers' homes based on reasonable suspicion, so that a Louisiana probationer was necessarily aware of his decreased right of privacy.

B. Whether Defendant Consented to the Search

An issue which defendant failed to address in his motion is whether, by accepting parole, and acknowledging the conditions of parole, he consented to a warrantless search of his residence. Arguable, defendant had a choice: stay in DOC or agree to the conditions of parole and be released. By choosing release, he necessarily agreed to the warrantless search of his residence. A case based upon the warrantless search of a probationer's residence came before this court two years ago, United States v. McCarthy Carter, Cr. 03-00103, 136 Fed.Appx. 40 (2005). In an unpublished disposition, the Ninth Circuit remanded for factual findings concerning whether the defendant's execution of an acknowledgment of conditions, which included permitting his probation officer to visit or search his place of residence at reasonable times, was voluntary. The government believes it is not necessary to reach this issue, however, for the reasons set forth below.

C. Parolees May Be Searched For Any Legitimate Reason

The cases cited above concern people on probation, not parole. It is well settled that state parole systems can constitutionally authorize warrantless parole searches for reasonable suspicion. See, for example, United States v. Lewis, 71 F.3d 358 (10th Cir. 1995), and United States v. Payne, 181 F.3d 781 (6th Cir. 1999), where the decisions turned on whether the warrantless searches comported with state regulations. Guam law, however, does not set a lower boundary for such a search. The issue here, therefore, is whether a state law may constitutionally provide for searches of parolees at any time, for any or no reason.

- 5 -

United States v. Crawford, 372 F.3d 1048 (9th Cir. 2004) (en banc), discussed the California parole system, which has adopted such a policy. The defendant, a career criminal, was on parole, and had executed a "Fourth Waiver" which signified his consent to a search by any law enforcement officer, *with or without cause.* In short, his parole officer did even need a reasonable suspicion to subject him to a warrantless search. FBI agents believed defendant had been involved in an old bank robbery, and conducted the parole search themselves, purely as a pretext to talk to him. They did not expect to find any evidence of the robbery at defendant's residence. During the course of the search, however, Crawford agreed to come to the FBI office, and eventually confessed to the crime. The district court denied his motion to suppress the confession, but a three-judge panel of the Ninth Circuit held the search was illegal and suppressed the confession because it was not sufficiently attenuated from the search. Sitting en banc, a majority reversed the panel, assuming but not deciding that the parole search was illegal, and focusing on whether the confession was "fruit of the poisonous tree" and thus barred by Wong Sun v. United States, 371 U.S. 471 (1963). Five members of the court, however, would not have reached that issue, but rather would have held that because "Crawford was a California parolee and, as such, subject to random searches as well as seizures and detention, he was not the victim of any Fourth Amendment constitutional violation in the first place." Id. at 1062.

Judge Trott's 13-page opinion emphasized that parolees are under the legal custody of the department of corrections. Probation is a matter of choice (the court may impose it or not); parole is provided for by law, and is available to those in custody who qualify for it. The terms of parole are not a contract, but rather specific rules which govern all parolees. Hence, it is inaccurate to style the parole order which Crawford signed as a "Fourth Amendment waiver." "[C]onsent and waiver cannot be used to validate parole conditions, and neither can the lack thereof be used to invalidate them." Id. at 1064. "When Crawford was released on parole, whether he liked it or not, and whether he consented to it or not, he became subject to a search

- 6 -

*and* seizure condition of parole that (1) recognized his status as still in custody, and (2) was designed appropriately to effectuate tight supervision of him." Id.

The California Supreme Court has recognized that parolees are subject to search without even reasonable suspicion, subject to the one criteria of Griffin, 483 U.S. at 875, that the search cannot be arbitrary, capricious or harassing. People v. Reyes, 80 Cal.Rptr.2d 734 (1998). Judge Trotter, joined by Judges O'Scannlain, Kleinfeld, Tallman and Clifton, agreed with the Reyes court, "that parolees as a class are different, and that they have forfeited any right to challenge a proper parole search conducted by designated law enforcement authorities while still in constructive custody as they serve out their sentences and make the transition back into society under the regulatory control of the Department of Corrections." Id. at 1066. Judge Trotter wrote that the "special needs" analysis which Griffin applied to probationers, is not applicable to those on parole. California provides sufficient constitutional protections because it authorizes "only narrowly tailored searches by a class of authorized officials rationally related to the individual's parole status," with protections against searches and seizures which are arbitrary, capricious, or harassing. "These qualifications accomplish the constitutional goal of keeping parole searches and seizures within the scope of reason demanded by the Constitution by mandating that the search or seizure be justifiably within the purpose of parole conditions at issue." Id at 1072.

Judge Kleinfeld, in a concurring opinion, agreed: "[t]here was no illegal governmental activity here, and that is the end of it." Id at 1076.

### III. SUMMARY

The court should deny defendant's motion to suppress the evidence seized pursuant to a warrantless search of his residence, regardless whether Guam law specifically authorizes such a search. First, there was a reasonable suspicion to believe that defendant had violated the terms of

//
//

- 7 -

his parole by consuming alcoholic beverages. Even if there had been no such evidence, however, the search would not have violated his Fourth Amendment rights because it was not arbitrary, capricious or harassing.

RESPECTFULLY SUBMITTED this 30th day of October, 2007.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: /s/ Karon V. Johnson
KARON V. JOHNSON
Assistant U.S. Attorney



GU ST T. 9, § 80.76

Page 1

9 G.C.A. § 80.76

GUAM CODE ANNOTATED
TITLE 9. CRIMES AND CORRECTIONS.
CHAPTER 80. DISPOSITION OF OFFENDERS
ARTICLE 5.PAROLE
§ 80.76. Standards Governing Release on Parole.

(a) Whenever the **board** considers the release of a prisoner for **parole**, the **board** shall order his release, if it is of the opinion that:

(1) his release is compatible with public safety and security;

(2) there is substantial likelihood that he will abide by law and conform to the **conditions** of **parole**;

(3) his release at that time would not depreciate the seriousness of his crime nor promote disrespect for law;

(4) his release would not have a substantially adverse effect on institutional discipline; and

(5) his continued correctional treatment, medical care or vocational or other training in the institution will not substantially enhance his capacity to lead a law-abiding life when released at a later date.

(b) In making its determination regarding a prisoner's release on **parole**, the **board** may consider, to the extent relevant, the following factors:

(1) the prisoner's personality, including his age and maturity, stability, sense of responsibility and any apparent development in his personality which may promote or hinder his conformity to law;

(2) the prisoner's **parole** plan;

(3) the prisoner's ability and readiness to assume obligations and undertake responsibilities;

(4) the prisoner's family status and whether he has relatives who display interest in him or whether he has other close and constructive associations in the community;

(5) the prisoner's employment history, his occupational skills and training, and the stability of his past employment;

(6) the type of home environment in which the prisoner plans to live;

(7) the prisoner's past use of narcotics or other harmful drugs, or past habitual and excessive use of alcohol;

(8) the prisoner's mental and physical make-up, including any disability or handicap which may affect his conformity to law;

(9) the prisoner's prior criminal record, including the nature and circumstances, recentness and frequency of previous offense;

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 1

GU ST T. 9, § 80.76  Page 2

9 G.C.A. § 80.76

(10) the prisoner's attitude toward law and authority;

(11) the prisoner's conduct in the institution, including whether he has taken advantage of the opportunities for self-improvement afforded by the institutional program;

(12) the prisoner's conduct and attitude during any previous experience of probation or **parole** and the recentness of such experience.

**SOURCE:** cf. Govt. Code § 39106; *M.P.C. § 305.7; Mass. ch. 264, § 29.

NOTES, REFERENCES, AND ANNOTATIONS

**COMMENT:** While any competent **parole board** is sure to take these criteria and factors into account, the Legislature and the public are entitled to the greater assurance that this explicit provision may give. No "good time" provisions are retained. The power of the **parole board** to release the prisoner provides more than enough incentive to a prisoner to give a good account of himself while in prison. On the other hand, automatic "good time" credit may have the effect of requiring the release of potentially dangerous person before such a release is warranted in the judgment of the Director of Corrections and the **parole board**.

9 G.C.A. § 80.76, GU ST T. 9, § 80.76

Current through P.L. 29-003 (2007)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



GU ST T. 9, § 80.80    Page 1

9 G.C.A. § 80.80

GUAM CODE ANNOTATED
TITLE 9. CRIMES AND CORRECTIONS.
CHAPTER 80. DISPOSITION OF OFFENDERS
ARTICLE 5. PAROLE
§ 80.80. Conditions of Parole.

(a) If a prisoner is released on **parole**, the **board** shall require as a **condition** of his **parole** that he refrain from engaging in criminal conduct. The **board** may also require, as a **condition** of **parole**, either at the time of his release on **parole** or at any time and from time to time while he remains under **parole**, that he:

(1) support his dependents and meet other family responsibilities;

(2) devote himself to an approved employment or occupation;

(3) remain within the geographic limits fixed in his certificate of **parole**, unless granted written permission to leave such limits;

(4) report, as directed, upon his release to his **parole** officer at such regular intervals as may be required, answer all reasonable inquiries by the **parole** officer, and permit the officer to visit him at reasonable times at his home or elsewhere;

(5) reside at any place fixed in his certificate of **parole** and notify his **parole** officer of any change in his address or employment;

(6) reside in a **boarding** home, hospital, or other **parole** residence facility, for such period and under such supervision or treatment as the **board** may deem appropriate;

(7) refrain from possessing firearms or other dangerous weapons;

(8) submit himself to available medical or psychiatric treatment;

(9) refrain from associating with persons known to him to be engaged in criminal activities or, without permission of his **parole** officer, with persons known to him to have been convicted of a crime;

(10) pay a fine imposed by the court as provided in this Chapter;

(11) satisfy any other **conditions** reasonably related to his rehabilitation or to the public safety and security.

(b) Before release on **parole**, a parolee shall be provided with a certificate or **parole** setting forth the **conditions** of his **parole**, and shall sign a statement agreeing to such **conditions**.

SOURCE: Government Code § 39103; M.P.C. § 305.13; *Mass. ch. 264, § 33; N.J.S. 3:3-123.15.

NOTES, REFERENCES, AND ANNOTATIONS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

GU ST T. 9, § 80.80 Page 2

9 G.C.A. § 80.80

**COMMENT:** Section 80.80 simply specifies in greater detail some of the **conditions** that may be imposed when **parole** is granted.

9 G.C.A. § 80.80, GU ST T. 9, § 80.80

Current through P.L. 29-003 (2007)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



GU ST T. 9, § 88.35                                        Page 1

9 G.C.A. § 88.35

GUAM CODE ANNOTATED
TITLE 9. CRIMES AND CORRECTIONS.
CHAPTER 88. CRIMINAL JUSTICE SUBSTANCE ABUSE ACT
    § 88.35. Sentencing of Felons: Parole of Felons: Treatment and Testing Based Upon Assessment Required.

    (a) Each person sentenced by the court for a felony committed on or after the effective date of this Act shall be required, as part of any sentence to probation, community corrections, or incarceration with the Department of Corrections, to undergo periodic testing and treatment for substance abuse which is appropriate to such person based upon the recommendations of the assessment made pursuant to § 88.30 of this Act, or based upon any subsequent recommendations by the Department of Corrections or the Superior Court of Guam, whichever is appropriate. Any such testing or treatment shall be at such person's own expense, unless such person is indigent.

    (b) Each person placed on **parole** by the Territorial **Parole Board** on or after the effective date of this act, shall be required, as a **condition** of such **parole**, to undergo periodic testing and treatment for substance abuse which is appropriate to such person based upon the recommendations of the assessment made pursuant to § 88.30 of this Act, or any assessment or subsequent reassessment made regarding such person during his incarceration or any period of **parole**. Any such testing or treatment shall be at such person's own expense, unless such person is indigent.

                    <General Materials (GM) - References, Annotations, or Tables>

9 G.C.A. § 88.35, GU ST T. 9, § 88.35

Current through P.L. 29-003 (2007)

                    Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



GU ST T. 9, § 85.54                                                                                                                Page 1

9 G.C.A. § 85.54

GUAM CODE ANNOTATED
TITLE 9. CRIMES AND CORRECTIONS.
CHAPTER 85. TERRITORIAL **PAROLE BOARD**
§ 85.54. Duties of **Parole** Officers.

The **parole** officer shall:

(a) be responsible for investigation, supervision and reports as may be requested by the **Board**;

(b) formulate methods of supervision, record keeping and reports;

(c) furnish to each person released under his supervision a written statement of the **conditions** of **parole** and instruct such person as to the same;

(d) keep informed of the conduct and **condition** of each person under his supervision and use all suitable methods to aid and encourage them and to bring about improvement in their conduct and **condition**;

(e) keep detailed records of his work.

<General Materials (GM) - References, Annotations, or Tables>

9 G.C.A. § 85.54, GU ST T. 9, § 85.54

Current through P.L. 29-003 (2007)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 4

**DETENTION / FULL-TIME / SPECIAL RELEASED PAROLEE**
**STATEMENTS OF THE CONDITIONS UNDER WHICH THIS PAROLE IS GRANTED**

CS ID: CF 380-99    02/07/02    to    02/06/2005

This Certificate of Parole will become effective on the date shown in its face after the following conditions are accepted by the prisoner as evidenced by his signature at the end thereof; duly witnessed:

1. That I will proceed to __address on record at Parole Services Division__, and upon arrival I will report in person immediately to my Parole Officer responsible for my supervision.

   Parole Officer: Donna M. Cruz                          MICHAEL P. QUINATA, CPO

2. That I will commit no crime.

3. That I will remain within the limits fixed in my Certificate of Parole and will not change address without permission of the Parole Officer.

4. That I will, between the first (1st) and fifth (5th) of each month, and on the final day of my parole, make a truthful written report to the Parole Officer; I will permit the Parole Officer to visit me at reasonable times at my home or elsewhere; and I will promptly and truthfully answer all inquiries directed to me by the Parole Officer.

5. That I will work regularly at a lawful occupation and support my dependents if any. When out of work, I will notify the Parole Officer immediately and will not change employment without the written approval of the Parole Officer.

6. That I will refrain from associating with persons known to be engaged in criminal activities, will not associate with persons known to have been convicted of crime without permission of the Parole Officer.

7. That I will not have in my possession any firearm or other dangerous weapon without the written permission of the Parole Officer and Parole Board.

8. That I will reside in a boarding home, hospital, or other parole residence facility, for such period and under such supervision or treatment as the Parole Board may deem appropriate.

9. That I will submit to available medical or psychiatric treatment as directed by my Parole Officer or the Parole Board as they may deem appropriate for my treatment and rehabilitation.

10. That I will pay all fines and any other costs imposed on me by the courts as required by law.

11. Special conditions are:

    a. That I will not be away from home between the hours of 9:00 P.M. and 6:00 A.M. except when actively employed and authorized by the Parole Officer.

    b. That I will not operate any motor vehicle unless authorized by my Parole Officer.

    c. That I will immediately contact my Parole Officer if I am arrested or questioned by law enforcement officers regarding any crime as a suspect or witness.

    d. That I will communicate with the Parole Board, at any time, if my Parole Advisor and Parole Officer are unavailable.

    e. That I will not purchase, possess, use, consume or administer controlled substances in any form, nor use or consume any alcoholic beverages or liquor, nor frequent such places where such articles are sold, dispensed, used or given away, except as administered or directed by competent medical authority.

    f. That I will submit to any drug and alcohol examinations as ordered by the Guam Parole Board, Chief Parole Officer and/or Parole Officer.

    g. That I will follow all oral and/or written instructions given to me by Parole Services Division and the Guam Parole Board.

    h. That I will permit parole officers to search my person, vehicle and residence for firearms and illegal controlled substances at any time such as search is requested. Failure to allow a search will be considered a violation of parole.

    i. That I will obtain employment within sixty (60) days upon being placed on parole. I understand that failure to obtain employment will result in my placement in the parole residence facility until such time that I secure employment.

    j. That I will refrain from any common-in-law relationship (co-habitation) unless legally married. I understand that if I do not comply with this condition I will be brought before the Guam Parole Board.

    k. That I will abide by all of the conditions as stipulated in my judgement.

    l. That I will perform community service as designated by my parole officer.

I understand that my release rests in the discretion of the Guam Parole Board and that if I do not demonstrate capacity and willingness to fulfill the obligations of a law-abiding citizen, or if my continuance on parole becomes detrimental to the integrity of the parole system or incompatible with the welfare of society, I may be arrested in accordance with provisions of Section 80.82 of the Criminal and Correctional Code of Guam and re-imprisoned pending a hearing to determine if my parole or conditional release should be revoked.

I have read or had read to me, the foregoing conditions governing my release on parole. I fully understand them, and will abide and strictly follow them. I also understand that if I violate them in any manner, I may be re-committed to prison. I have also received my personal copy of this Statement of the Conditions Under Which This Parole is Granted.

Vince L. H. Cruz
PAROLEE'S SIGNATURE                              DATE: 2/7/02

Donna M. Cruz, PO I
PAROLE OFFICER'S SIGNATURE                       DATE: 2/7/02

# DEPARTMENT OF CORRECTIONS
## PAROLE SERVICES DIVISION
### TIYAN, GUAM
Tel: 473-7001

JANUARY 31, 2003

**MEMORANDUM**

**TO:** CHIEF PAROLE OFFICER

**FROM:** PAROLE OFFICER

**SUBJECT:** REF: PAROLEE VINCE L.H. CRUZ

**EVENTS LEADING TO OPERATION "WALK TO REMEMBER"**
On January 24, 2003 (Friday) at around 1630 hours parolee Vince L.H. Cruz reported to PSD, he was accompanied by Millie Santos and her two year old daughter Kai' Mana. Parolee informed me that his cousin Jonah Mesa had left the island and that he plans to get married with Millie, he wanted to move from Mong Mong to Tamuning with Ms. Santos. Ms. Santos was briefed to parolee Cruz' conviction CSC, she was also informed that she is not to leave her child alone with Parolee Cruz. It was then an emergency erupted with another client Bobbie Fejeran and PO Camacho instructed me to remedy it. Parolee's change of status was completed and verbally approved but only for the weekend, he was instructed to call in on Monday, January 27th to further discuss issues. Parolee Cruz did not call as of January 29th.

On January 29, 2003 at around 0830 hours PO Linda Charfauros informed me that on Friday January 24, 2003, CO Taijeron informed her that he had seen Parolee Vince L.H. Cruz at McDonald's on January 22, 2003 (Wednesday) at around 2400 hours and appeared to be intoxicated. Parolee Cruz acknowledged CO Taijeron.

On January 29, 2003 at around 0840 hours CO Gray informed PO Martinez that he had seen parolee Candelaria Mendiola at around 0700 hours today with CO Ed Perez. CO Perez was driving a green Rodeo SUV. PO Martinez asked if could assist. I informed her that I wanted to follow up on two of my clients, Arnold Kitano and Vince L.H. Cruz. Both Mendiola and Kitano were found and that was when permission from PO Camacho and Chief Parolee Officer as to continue with the check for Parolee Cruz and others this evening for Operation "Walk to Remember".

051

## OPERATION "WALK TO REMEMBER"

On or about January 29, 2003 at around 2100 hours PO's were briefed as to the operation. PO Charfauros, PO Martinez, CO Gray and myself present. A phone call was made to verify if Parolee Cruz was at home, the telephone number was a cell phone and no one answered. We then proceeded to Tamuning, after several minutes of trying to find the location of parolee's residence at around 2155 hours we arrived. I noticed that there were beer bottles outside the door of the condo. I knocked on the door and we were greeted by parolee Cruz who was alone at the time. I asked we could just take a look around and parolee agreed. I noticed numerous valuable items such as duty free display perfumes, large screen TV and so forth. I inquired about if parolee had committed any curfew violations and parolee denied this. He led us into the Master Bedroom. A cursory check was conducted and PO Martinez who found a dark colored bag on top of a DVD player, small zip lock bags, rubber bands and an electronic scale were found. It was then parolee was cuffed and instructed to sit on the bed. A "Smirnoff" alcoholic beverage was found on top of a night stand still cool to the touch. Parolee was asked if there were any drugs or weapons in the home. He stated "no". PO Martinez later found a drawer filled with large amount of U.S. currency mostly in large bills of fifties and hundreds.

At this time Ms. Santos arrived at the condo with her daughter, and was being interviewed by PO Charfauros in the living room. Parolee then yelled to Ms. Santos to bring him a drink, I offered him water that was on the dresser. He stood up and said "no" and nudge CO Gray. He insisted that he wanted a cold drink in the refrigerator. We instructed him to sit and calm down and that he needed to co-operate. A soda was given to him. Shortly after that he insisted on smoking a cigarette, he was given this as well. PO Camacho was informed of our findings and also notified that parolee was becoming combative an belligerent. It was then when it was decided that parolee be removed for safety reasons. The search ceased and we secured the area and took into custody, the dark colored bag containing small zip lock bags, rubber bands and the large amount of U.S. Currency in the dresser. PO Camacho relayed for PO Martinez and myself to go back up to the condo and request to continue the search with Ms. Santos while PO Charfauros and CO Gray rendezvous with him at Hornet Sporting Goods and parolee in custody.

PO Martinez and myself knocked on the door and asked Ms. Santos to continue the search, she stated "go ahead", it is noteworthy to mention that Ms. Santos was present during the search. PO's asked if there were any drugs in the condo and she stated "no". She did inform us that she had a "tip" box from her employment at "Somjai's", the box contained mostly ones, fives and ten dollar bills. PO Camacho arrived at the condo shortly after that and informed GPD Officer J. Bagaforo of our findings.

At this time Ms. Santos contacted her daughter's father Patrick Madayag and arrived shortly after in light colored sedan. PO Martinez, PO Camacho and myself left the building and locked the door so Ms. Santos could bring her daughter down stairs to Mr. Madayag.

Parolee needed to use the restroom and was escorted by CO Gray and entered the condo and utilized the guest restroom. PO Camacho instructed that parolee be transported to ACF for safety reasons.

052

PO Camacho continued with the search, he found what a appeared to be a glass "Ice" pipe in the master bathroom trash can. He also found a zip lock bag 3x5 partially filled with a crystalline substance hidden in a blue jacket hanging in the closet in the master bedroom. A fifty dollar bill was also found by PO Martinez in a traveling bag. Ms. Santos stated that this money was hers.

GPD Officer J. Bagaforo arrived and took a report. Crime Lab was also informed to meet us as well DEA Agent N. Sablan. Pictures were taken from both GPD and DEA. DEA Agent N. Sablan took custody of the U.S. currency from the dresser, box and the fifty dollar bill found in the baggage. GPD J. Bagaforo took custody of the suspected crystalline substance. Also was found was a receipt for a storage in the name of John Peter Cruz and secondary person in charge to access the unit was Parolee Vince Cruz. Officer Bagaforo took the receipt in order to obtain a search warrant. Operations ceased at around 0400 hours January 30, 2003 and started up awaiting a search warrant at 0800 hours. At around 1129 hours we were informed that the search warrant was in order signed by Judge Manibusan and to meet at the Guam Mini Storage, Harmon. At around 1134 hours PO Martinez, CO Gray and myself arrived along with DEA and VCTF Officers. The storage unit B-20 was opened only to find approximately 17 large tires with rims, entertainment center, a large Air Compressor, portable air-condition unit that appeared to tampered with. This officer interviewed the Assistant Manager Pam Pangelinan who stated that the last time she had seen any enter the storage unit was about two weeks ago. Two men, the first one was John P. Cruz and the second one was parolee Vince L.H. Cruz, she identified him from the Quick Reference that was presented. Negative on findings of any drugs, paraphernalia, or weapons. Copies of the search warrant was place outside and inside the storage unit, we secured at about 1200 hours.

Donna M. Cruz

053