DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VINCE LUIS HOCOG CRUZ,<br><br>Defendant. | Criminal Case No. 04-00053<br><br>**ORDER RE MOTION TO SUPPRESS PHYSICAL EVIDENCE** |

The Renewed Motion to Suppress Evidence[1] filed by Defendant, Vince Luis Hocog Cruz came before this court for an evidentiary hearing on September 9, 2008. After hearing the testimony of witnesses and argument from counsel, the court took the motion under advisement. For the reasons discussed more fully herein, the court sets forth the bases for its decision **DENYING** the motion.

## I. FACTS

In February 2002, the Defendant was placed on parole and was supervised by parole officer Donna M. Cruz ("Officer Cruz"). In 2002, the Defendant resided on West Malate Street, Mongmong, Guam. He was living with his cousin, Jonah Mesa (Ms. Mesa") and her children, in an addition, on the right side of the home. Officer Cruz recalls visiting the home which was furnished. Officer Cruz also noted that there were Rottweiler dogs. Officer Cruz stated that she

---

[1] The Defendant had previously filed a Motion to Suppress, on October 10, 2007. *See* Docket No. 11. At the hearing on the motion held on January 7, 2008, the Defendant withdrew the motion. *See* Docket No. 23.

spoke to Ms. Mesa on a regular basis.

On January 24, 2003, the Defendant and his then girlfriend, Millie Santos (now his current spouse referred to hereinafter as "Ms. Millie Cruz") met with Officer Cruz at her office and asked for permission to allow the Defendant to change his residential status. The Defendant informed Officer Cruz that he intended to marry Millie and wanted to move into her condominium in Tamuning, where she lived with her two-year-old daughter. He also told Officer Cruz that he had to vacate the premises in Mongmong that he was sharing with Ms. Mesa, by the end of January, since she and her children were leaving the island and he would have no place to stay.

Officer Cruz testified that she orally granted the Defendant's request for a change of residential status but that he needed to call her office on the following Monday, January 27, 2003.[2] She further testified that when a parolee initially comes in to request a change in residential status, she may orally approve the change but still needs to formally process the request and obtain written approval from her supervising officer. In this case, her supervising officer, Officer Camacho, granted "temporary approval subject to verification" for the move. *See* Ex. 3. Officer Cruz explained that "verification" meant that there was running water and power turned on, in other words, that the new residence was habitable. On the 27th of January the Defendant failed to call Officer Cruz.

At that time the Defendant was unemployed and was subject to a curfew from 9:00 p.m. to 6 a.m. as part of his release conditions. Officer Cruz received information from a fellow corrections officer that the Defendant had been observed at McDonald's at midnight on January 22, 2003, and appeared to have been intoxicated. On January 29, 2003, parole officers decided to execute "Operation Walk to Remember" to search for the Defendant and two other parolees. Officer Cruz testified they first searched for the Defendant at another parolee's residence, but did not find the Defendant there, so they next went to the Mongmong residence. She stated that it was clear no one

---

[2]The testimony from Officer Cruz was unclear as to whether she told the Defendant he only had approval for staying with Ms. Millie Cruz for the weekend or whether he was conditionally approved to permanently move subject to further verification of the living conditions.

- 2 -

was residing there. She could see through the windows that there was no furniture and the dogs were gone. In fact, the search confirmed an earlier conversation with Ms. Mesa who had told Officer Cruz that everything was out of the home.

Officer Cruz testified that at the time she believed the Defendant was residing at the Sunset Villa Condos in Tamuning with his girlfriend. As noted herein, she knew from Ms. Mesa that the Mongmong premises had been vacated, and upon her visit there earlier that day, the home seemed abandoned. Accordingly, the officers decided to make a "home visit" to the Tamuning residence at approximately 9:55 p.m.. As they approached the condo, they noticed beer bottles outside the front door. Officer Cruz knocked on the door and the Defendant answered. He was clad in only shorts and stated he was home alone. When asked if they could take a look around his "residence," the Defendant allegedly agreed.

Once inside, Officer Cruz apparently noticed suspiciously valuable items in the living room, such as duty free display bottles of perfumes and a large screen TV. Officer Cruz then asked the Defendant to show them his bedroom. The Defendant led the officers to his bedroom. To Officer Cruz, it was clear that the Defendant was residing there; she stated that there were approximately 50 pairs of mens shoes and mens socks.[3] In his bedroom, there was a cold alcoholic beverage on the left nightstand. Parole Officer Liza Martinez ("Officer Martinez") found a blue bag on top of a DVD player, which contained zip lock baggies and an electronic scale. Currency was found in the amount of $9,023 in a dresser drawer. Officer Martinez found an "ice" pipe in the wastebasket in the Defendant's bedroom and a plastic bag of "ice" hidden in a blue jacket hanging in his closet. The DEA lab report indicates the bag contained 31.9 grams of net weight of methamphetamine hydrochloride ("ice"), 86% purity.

While the officers were at the Tamuning residence, Ms. Millie Cruz returned home and was told of the nature of the search. There was conflicting testimony at the hearing. Ms. Millie Cruz

---

[3]At the hearing, Officer Cruz mentioned that ordinarily underwear would be found if one was residing at a locale, in this instance the Defendant told the officer that he did not wear any and none was found.

1 testified that she did not give consent for the search, whereas Officer Cruz stated that she was informed of the ongoing search and did not contest the search. And, in fact, when the officers exited the residence and sought to re-enter the residence, Ms. Millie Cruz opened the door for them to enter.

## II. DISCUSSION

### A. THE PAROLE SEARCH WAS REASONABLE BECAUSE THE SEARCHING PAROLE OFFICERS HAD PROBABLE CAUSE TO BELIEVE THAT DEFENDANT LIVED AT THE TAMUNING RESIDENCE.

The Defendant renews his argument that the evidence seized should be suppressed because it was obtained without a warrant and without consent. The Fourth Amendment restrains the government from performing "unreasonable searches and seizures." U.S. CONST. amend. IV. The touchstone in evaluating the permissibility of any search is "reasonableness." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). In most cases, reasonableness requires a warrant and probable cause. *Id.*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980). State officials may cross the threshold of a home without a warrant only if exigent circumstances exist or a person with authority (or apparent authority) consents to their entry. *Steagald v. United States*, 451 U.S. 204, 211-12 (1981). Even if a person with authority consents, if another person with authority is present and objects to entry, the officials should resolve the dispute by seeking a search warrant. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). If officials search the residence over the objections of a co-tenant, the search is unreasonable as to the objecting party. *Id.*

In this instance, there was no warrant and probable cause, nor were there exigent circumstances. The officers made their search based upon their reliance on the Defendant's prior consent to search his residence as a condition of his parole.[4] One exception to the warrant

---

[4] Prior to his release from prison the Defendant signed a "Statement of Conditions Under Which Parole is Granted." Condition 11(h) of that Statement required the Defendant to agree to allow parole officers "to search my person, vehicle and residence for firearms and illegal controlled

- 4 -

requirement permits warrantless searches that are authorized by valid probation or parole conditions. *Griffin*, 483 U.S. at 880 ("The [warrantless] search of Griffin's residence was 'reasonable' . . . because it was conducted pursuant to a valid regulation governing probationers.")

The Defendant argues that because the residence searched was that of Ms. Millie Cruz and not his, the search was illegal. In addition, the Defendant contends in his briefing that he did not give consent to search the residence, nor did she. "[B]efore conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc); *see also Steagald*, 451 U.S. at 220 (holding that officials may not enter a third-party's home to locate the subject of an arrest warrant unless they also hold a search warrant for the home).

In *Motley*, officers were looking for a parolee at an apartment belonging to his girlfriend. Everything was in the girlfriend's name and she paid the rent and all bills associated with the apartment. *Motley,* 432 F.3d at 1075. However, her address was the most recent address the parolee had reported to his parole officer, *Id.* at 1075-76. When the officers knocked on the door, they were informed repeatedly by the parolee's girlfriend, who lived there with their infant son, that the parolee did not live there and that he was in state custody. *Id.* The police refused to listen and proceeded to search the residence. *Id.* When the search was challenged, the Ninth Circuit upheld the district court, holding that the officers were entitled to rely on their knowledge of the parolee's most recent address, as reported by the parolee to his parole officer. *Id.* at 1082.

In this instance, the Defendant had informed his parole officer that he wanted to move in with Ms. Millie Cruz because he intended to marry her and had to vacate the Mongmong premises. His parole officer Donna M. Cruz approved the change of residential status. *See* Docket No. 48, Ex. 2. Although there was some question as to whether the approval extended beyond the weekend,

---

substances at any time such a search is requested. Failure to allow a search will be considered a violation of parole." *See* Docket No. 48, Ex. 2.

- 5 -

once the parole officer spoke to Ms. Mesa, and visited the apparently abandoned Mongmong residence, it seemed to clear to her that the Defendant was in fact, residing on a permanent basis with Ms. Millie Cruz. The court finds Officer Cruz's testimony in this regard reliable. Although Ms. Millie Cruz testified that the Defendant was still residing at Mongmong at the time, the court finds the evidence supports the contrary. The Mongmong premises had been abandoned, Officer Cruz testified that she could see through the windows that the home was empty of furnishings and that the dogs were gone.

The Ninth Circuit has applied relatively stringent standards in determining what constitutes probable cause that a residence belongs to a person on parole. *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006). "It is insufficient to show that the parolee may have spent the night there occasionally. Instead, the facts known to the officers at the time of the search must have been sufficient to support a belief, in 'a man of reasonable caution,' that [the parolee lived at the searched residence.]" *Id*.

In *Howard*, the Ninth Circuit reviewed its prior decisions and identified four "patterns" among those cases in which the court found probable cause:

> (1) the probationer 'gave [the officers] good reason to suspect that the [probationer] was using [the searched home] as his home base";
>
> (2) the probationer had a key to the searched residence;
>
> (3) the probationer (or someone close to him) admitted that he resided at the searched home; and
>
> (4) the probationer "did not appear to be residing at any address other than the one searched."

447 F.3d at 1266.

*Howard* does not indicate how many of the patterns should be present or what weight any one should be afforded. However, two of those patterns are presented by the facts of this case. First, the Defendant gave the officers good reason to suspect he was using that residence as his home base. He answered the door only in a pair of shorts at approximately 10:00 p.m.(after curfew) and Officer

- 6 -

1  Cruz knew at that time that the only place he could be residing at was the Tamuning condo. Second,
2  there did not appear to be any other residence he could be living at. Officer Cruz did have probable
3  cause to believe the Defendant resided at that residence. Accordingly, under *Howard*, the
4  warrantless search here involved the legal entry into and search of real property, which was the
5  Defendant's. In sum, the search was reasonable under the Fourth Amendment.

### B. **WHETHER THE DEFENDANT HAS STANDING TO CONTEST THE SEARCH**.

The Government also raised the issue of the Defendant's standing to contest the search. The Government argued that if the court was to find that the Tamuning condo was not the Defendant's residence, the Defendant would have no standing to contest the search. The Government cites to *Rakas v. Illinois*, 439 U.S. 128 (1978) for support. In *Rakas,* the police received a robbery report and stopped a suspected getaway car. The petitioners were passengers in the car. Upon searching the car, the police found a box of rifle shells in the glove compartment and a sawed-off rifle under the front passenger seat and arrested petitioners. *Id.* at 422. The petitioners were convicted in an Illinois court of armed robbery at a trial in which the rifle and shells were admitted as evidence. Before trial petitioners had moved to suppress the rifle and shells on Fourth Amendment grounds, but the trial court denied the motion on the ground that petitioners lacked standing to object to the lawfulness of the search of the car because they concededly did not own either the car or the rifle and shells. *Id.* The Supreme Court maintained that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.* at 425. The Court held that it is proper to permit "only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id.*

The Government also looks to the case of *United States v. Cunag*, 383 F.3d 888 (9th Cir. 2004)[5] for support. In *Cunag*, the defendant rented a (non-smoking) room at a hotel with a stolen credit card. After hotel management became suspicious, the police were contacted to help the

---

[5]The Government cites to *United States v. Cunag*, 371 F.3d 1060 (9th Cir. 2004), however, this opinion was ordered withdrawn *see United States v. Cunag*, 382 F.3d 1153 and is superseded by *United States v. Cunag*, 386 F.3d 888 (9th Cir. 2004).

- 7 -

1 manager evict the defendant.  However, the police took no action regarding the room until smelling
2 smoke, fearing fire, and observing a man they had probable cause to arrest for a felony close the
3 door in their face.  In other words, there was probable cause for the search.

4         The Defendant claims that in this instance the search was unreasonable because, as an
5 overnight guest, he has standing to challenge the search of the bedroom he shared with his then
6 girlfriend.  *See Minnesota v. Olson*, 495 U.S. 91 (1990).  In *Olson*, the Court held that a houseguest
7 has a legitimate expectation of privacy in his host's home, sufficient to "enable him to be free in that
8 place from unreasonable searches and seizures." *Id*. at 98.

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home, we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

*Id*. at 99.  The Court ultimately affirmed the lower court's finding that an overnight guest has established a "sufficient connection with the premises to be treated like a householder" for standing purposes. *Id.* at 95.

        Although a parolee released back into the community has a greatly reduced expectation of privacy, he still retains the right to contest an unreasonable search.  A [parole] search condition may significantly diminish, but does not eliminate, the probationer's reasonable expectation of privacy. *United States v. Knights*, 534 U.S. 112, 120 (2001).  The Government agrees that if the Defendant is found to be an overnight guest, he does have standing. Of course, the Government maintains he was not an overnight guest.  This court agrees.

        The testimony of Ms. Millie Cruz belies any finding that the Defendant was an overnight guest.  Ms. Millie Cruz testified that the Defendant did not live with her, he had no key to the Tamuning condo, and only kept a small basket of clothes and toiletries there.  She further testified that the Defendant had no intention of staying over the night in question because she and the Defendant were going to return to the Defendant's residence in Mongmong.  It was Ms. Millie

- 8 -

Cruz's belief that the Defendant was only permitted to stay with her for the weekend. The night of the search and subsequent arrest of the Defendant was a Wednesday night. She stated that she and Defendant did not want to violate the conditions of the Defendant's parole. She testified that the Defendant was at the condo waiting for her return. The court does not find this testimony credible. The Defendant had a curfew of 9:00 p.m., and thus he was already violating the terms when he was waiting for Ms. Millie Cruz to return. Furthermore, he also had been observed violating his terms of parole on January 22, 2003 when he was seen at a McDonald's restaurant at midnight and appeared to have been intoxicated. The court does not find that concern for violating the terms of his parole were of paramount concern to the Defendant.

Based on the testimony presented at the evidentiary hearing, it seems clear that the Defendant was not an overnight guest. He was much more. In fact the Defendant was a resident. Accordingly, the court finds *Olson* inapplicable to the facts of this case.

### III. CONCLUSION

Based upon the foregoing, the court finds that the Defendant was in fact residing with Ms. Millie Cruz on January 29, 2003. As such, the parole officers had the right to perform a warrantless search of the condo, because it was his residence. Thus, there was no violation of the Defendant's Fourth Amendment rights. Accordingly the Motion to Suppress is **DENIED**.

In light of this court's order, trial in this matter is hereby scheduled for October 1, 2008 at 9:30 a.m. All trial documents should have been submitted or filed by now, to the extent any further documents are to be submitted or filed, the parties are to do so no later than noon, September 24, 2008. A final pretrial conference is scheduled for September 30, 2008 at 9:30 a.m.

**IT IS SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
    Chief Judge
**Dated: Sep 23, 2008**